United States District Court
For the Northern District of California

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| RODNEY JEROME WOMACK, | No. C 08-3594 MMC (PR) |
| Petitioner, | **ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS; DENYING CERTIFICATE OF APPEALABILITY; DIRECTIONS TO CLERK** |
| v. | |
| TIM VIRGA, Warden, | |
| Respondent. | |

Before the Court is the above-titled petition for a writ of habeas corpus, filed pursuant to 28 U.S.C. § 2254 by petitioner Rodney Jerome Womack, who proceeds pro se and challenges the validity of a judgment obtained against him in state court. Respondent has filed an answer to the petition, and petitioner has filed a traverse.[1]

## I. PROCEDURAL HISTORY

In 2004, in the Superior Court of Contra Costa County, petitioner was convicted of second degree robbery (Cal. Pen. Code §§ 211, 212.5(c)). (Ex. A at 259-60.)[2] In addition, the trial court found true allegations petitioner had suffered three prior "strike" convictions

---

[1] Petitioner initially brought this action against J. Walker, the former warden of California State Prison - Sacramento, where petitioner is incarcerated. Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Tim Virga, the current warden of California State Prison - Sacramento, is hereby SUBSTITUTED as respondent in place of petitioner's prior custodian.

[2] All references herein to exhibits are to exhibits submitted by respondent in support of the Answer.

(Cal. Pen. Code §§ 667(b)-(i), 1170.12), and two prior serious felony convictions (Cal. Pen. Code § 667(a)(1)), and had served three prior prison terms (Cal. Pen. Code § 667.5(a)). (Ex. A at 236-39, 837-38.)

On March 8, 2005, the trial court sentenced petitioner to an aggregate term of 35 years to life. (Ex. A at 837-38.)

In a reasoned opinion, the California Court of Appeal affirmed the trial court's decision (Ex. E), and the California Supreme Court summarily denied the petition for review (Ex. G).

Petitioner also filed a state habeas petition in the California Supreme Court, which was summarily denied. (Exs. H, I.)

On July 28, 2008, petitioner filed the instant petition for a writ of habeas corpus.

## II. STATEMENT OF FACTS

The California Court of Appeal found the facts underlying petitioner's conviction to be as follows:

*A. The Bank Robbery*

On February 9, 2004, at approximately 11:20 a.m., a man approached bank teller Denise Owens ["Owens"] at the Bank of America in Antioch and told her: "This is a robbery, give me only your 50s and 100s. I have a gun. Don't hesitate. Or I will shoot."[3] Owens believed the man had a gun in his pocket.[4]

She gave the man approximately $5,000 to $6,000, and he left the bank. Owens gave the alarm, and the police were called. Owens described the robber as approximately six feet tall, in his late 30's or 40's, and Black. He was wearing a baseball hat and seemed "pretty big," although she could not estimate his exact build because he was wearing a zippered jacket.[5] Owens could not remember any unusual markings on his face or cheeks.

As the robber left the bank, he told security guard Anthony Dayrit ["Dayrit"] that he went to the wrong bank. Unaware the bank was robbed, the guard told

---

[3] The robber also told Owens: "I will blow your fucking head off."

[4] Owens initially testified the robber had his right hand in his pocket, but agreed the bank surveillance tape showed his left hand in his pocket. [Petitioner's] mother testified that [petitioner] is left-handed.

[5] During in limine proceedings, defense counsel described [petitioner] as "a black male, age 41, [whose] height is six to six-one and his weight is 210."

him, "Have a nice day." When the bank manager told the security guard about the robbery, the guard ran after the "tall black guy who was wearing a 49er's cap," but was unable to find him. The guard described the robber as approximately six feet, two inches tall, 200 to 205 pounds, and wearing a 49er's cap, a black jacket, black pants, and black shoes.

Michael Carter, Sr. was arriving for work at the nearby Citibank when he saw a man running away from the Bank of America toward a parked car. Carter described the man as a "darker complexion Afro-American male," about five feet ten inches to six feet tall, about 210 to 220 pounds, and wearing a dark coat and hat. He got into a small sedan driven by a younger man, who drove off in such a hurry that he ran over the concrete blocks in the parking lot.

*B. The Investigation and Photo Lineups*

Police obtained two photographs from the bank's surveillance tape that showed the robber with a deformed left ear and scarring on his left cheek.[6] The photos were included with a briefing bulletin regarding the robbery. A few days later, an officer was investigating a shooting when she noticed [petitioner] at the scene, and thought he resembled the suspect in the briefing bulletin. She got [petitioner's] name and address, and forwarded it to Detective Dee, who was investigating the robbery.

Officers searched the home where [petitioner] lived with his mother, and seized a photo of [petitioner] that resembled the robber shown on the bank surveillance tape. They did not tell his mother that [petitioner] was suspected of bank robbery. A few days later, his mother called police and said she wanted [petitioner] to come down to the station to clear things up so the police would not come to her home again. Detective Mike Schneider testified that [petitioner's] mother told him that [petitioner] called her and told her he robbed a bank and the police were looking for him. [Petitioner's] mother testified that she told the detective [petitioner] was going to turn himself in, but denied that [petitioner] admitted robbing a bank. [Petitioner] surrendered on February 23.

On the day after [petitioner's] arrest, Detective Dee showed Dayrit, Owens, and Amber Beckett ["Beckett"], a teller who was working next to Owens at the time of the robbery, a photo lineup that included a January 2004 Alameda County booking photo of [petitioner]. Owens and Beckett were unable to make an identification, but Dayrit positively identified [petitioner].[7]

On March 11, 2004, Dee created a new photo lineup ("the second lineup") to show to Carter, using an October 2002 Antioch Police Department booking photo of [petitioner] that Dee believed more closely resembled [petitioner's] appearance at the time of his arrest. Carter was unable to make an identification. On March 17, 2004, the prosecutor met with the witnesses before the preliminary hearing and showed the second lineup to Owens, Beckett, and Dayrit. All three witnesses identified [petitioner]. The prosecutor

---

[6] According to the FBI agent who created the still photographs from the surveillance tape, the photos were of unusually good quality.

[7] Beckett testified she was shown two photo lineups on February 24, and tentatively identified [petitioner] in at least one of them. Dee recalled creating another lineup on February 24, using a different photo of [petitioner], but testified he never showed that lineup to any of the witnesses.

3

and Beckett testified that the witnesses viewed the lineup separately, but Owens and Dayrit testified the three witnesses were sitting together when the prosecutor showed it to them.

*C. Trial Evidence of [Petitioner's] Identification and Evidentiary Rulings*

[Petitioner] was charged with second degree robbery.[8] Pursuant to in limine rulings, the bank tellers and security guard were not permitted to identify [petitioner] during trial. But the photos made from the surveillance tape were shown to the jury, and [petitioner] was required to stand in front of them while the jurors compared him to the person depicted in the photos. [Petitioner's] mother also testified he had a deformed or "cauliflower" ear from high school wrestling, and acne scarring on his cheeks.[9] Detective Dee testified [petitioner] walked into court with the same kind of "duck walk" shown in the bank's surveillance photos, but also acknowledged that a person's gait cannot be determined from a still photo.

[Petitioner] told the court he intended to "start yelling" "as soon as [he] step [ped] in the courtroom" to tell the jury that he was not identified in the earlier photo lineups, but defense counsel was concerned about whether evidence of the witnesses' initial failure to identify [petitioner] would "open up the door to subsequent lineups." The prosecutor did not object to the admission of the evidence, as long as Beckett was permitted to testify that she recalled identifying [petitioner] on February 24. The court stated that admission of evidence regarding the first photo lineup would "open[ ] up the issue," and would result in prejudice, undue consumption of court time, and confusion for the jury.[10] The court further found there was "a big, big difference" between [petitioner's] appearance in the photo shown in the first lineup and on February 23, 2004, when he surrendered to police. The court concluded that the evidence of nonidentification was not "very probative," and ruled it was not admissible under Evidence Code section 352.

Laetitia Mullin ["Mullin"] testified that [petitioner] was renting a room from her boyfriend at the time of the robbery. She recognized [petitioner] in a newspaper article about the robbery as the person in the surveillance photograph. Roy Neighan ["Neighan"] also saw the newspaper article and recognized [petitioner].[11] Neighan was in custody for petty theft when he saw [petitioner] at the Martinez detention facility. [Petitioner] talked about the robbery and told Neighan the security guard said, "have a nice day." [Petitioner] also told Neighan he used the money to buy services from prostitutes, and left the bank in a "little car" around the corner. Neighan contacted police while he was in custody and offered to provide information on

---

[8] The information also alleged three prior strikes, two prior serious felonies, and three prior prison terms. Their trial was bifurcated.

[9] His mother further testified [petitioner] had pierced ears, but had not recently worn an earring.

[10] The court also believed that the suggestiveness of the first lineup itself presented "a very, very, very close call," because of the lighting in [petitioner's] photo.

[11] Neighan knew [petitioner] through Mullin's boyfriend.

4

several crimes, including the robbery.[12]

The defense called several witnesses. Melvin Hackett ["Hackett"] testified that he was a "good friend" of [petitioner], and worked with him as a scalper at concerts and sporting events, where [petitioner] made a substantial amount of money.[13] Javier Oregel ["Oregel"] testified he knew [petitioner] since junior high school, and that [petitioner] came to his house unannounced between 11:00 a.m. and noon on the day of the robbery. [Petitioner] stayed until after dark, when Oregel drove him to a nearby motel.[14] But Oregel also admitted the person shown in the bank surveillance photos looked like [petitioner].[15]

Charles McClinton ["McClinton"] testified he was with [petitioner] at Oregel's house on a Monday a few months earlier, but could not recall the date. McClinton arrived at Oregel's about 12:30 or 1:00 p.m., and both men were already there.[16] During the evening, Oregel left with [petitioner] and returned without him.

. . .

The jury convicted [petitioner] of robbery. The court found the alleged prior convictions true and sentenced [petitioner] to 35 years to life in prison.

(Ex. E at 1-7) (footnotes renumbered).

## III. DISCUSSION

A.  Standard of Review

This Court may entertain a petition for a writ of habeas corpus "in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a); Rose v. Hodges, 423 U.S. 19, 21 (1975).

A district court may not grant a petition challenging a state conviction or sentence on the basis of a claim that was reviewed on the merits in state court unless the state court's adjudication of the claim: "(1) resulted in a decision that was contrary to, or involved an

---

[12] Neighan requested early release, but the police made no promises. Neighan was later released approximately three weeks early.

[13] Hackett also testified [petitioner] never wore an earring in his left ear, and it appeared the robber shown in People's Exhibit 3-B might be wearing an earring. [Petitioner's] bank statement showed a $300 deposit on February 4, 2004, and a $270 withdrawal on February 10, 2004.

[14] The motel records indicated [petitioner] registered at the motel that night.

[15] Oregel did not remember [petitioner] wearing an earring in his left ear.

[16] Oregel testified McClinton arrived in the late afternoon.

5

unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d); Williams v. Taylor, 529 U.S. 362, 412-13 (2000). Additionally, habeas relief is warranted only if the constitutional error at issue had a "substantial and injurious effect on the verdict." Penry v. Johnson, 532 U.S. 782, 796 (2001) (internal quotation and citation omitted).

A state court decision is "contrary to" clearly established Supreme Court precedent if it "applies a rule that contradicts the governing law set forth in [the Supreme Court's] cases" or if it "confronts a set of facts that are materially indistinguishable from a decision of [the Supreme] Court and nevertheless arrives at a result different from [its] precedent." Williams, 529 U.S. at 405-06. "Under the 'unreasonable application' clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." Id. at 413. "[A] federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." Id. at 411.

Section 2254(d)(1) restricts the source of clearly established law to the Supreme Court's jurisprudence. "[C]learly established federal law, as determined by the Supreme Court of the United States" refers to "the holdings, as opposed to the dicta, of [the Supreme] Court's decisions as of the time of the relevant state-court decision." Williams, 529 U.S. at 412. "A federal court may not overrule a state court for simply holding a view different from its own, when the precedent from [the Supreme Court] is, at best, ambiguous." Mitchell v. Esparza, 540 U.S. 12, 17 (2003).

On direct review and state habeas review, the state courts did not discuss the merits of the claims petitioner raises in the instant petition. The United States Supreme Court has recently clarified that a federal habeas court, in applying the review provisions of 28 U.S.C.

6

1  § 2254(d), looks to the result reached by the highest state court, and that the absence of
2  reasoning does not prevent application of the standard of review set forth in § 2254(d). See
3  Harrington v. Richter, 131 S. Ct. 770, 784-85 (2011).

4  B.  Petitioner's Claims

5       Petitioner claims his appellate counsel provided ineffective assistance.

6       A claim of ineffective assistance of counsel is cognizable as a claim of denial of the
7  Sixth Amendment right to counsel, which guarantees not only assistance, but "effective"
8  assistance of counsel. Strickland v. Washington, 466 U.S. 668, 686 (1984). In order to
9  prevail on a Sixth Amendment claim based on ineffectiveness of counsel, a petitioner first
10 must establish such counsel's performance was deficient, i.e., that it fell below an "objective
11 standard of reasonableness" under prevailing professional norms. Id. at 687-88. Second, the
12 petitioner must establish prejudice resulting from his counsel's deficient performance, i.e.,
13 that "there is a reasonable probability that, but for counsel's unprofessional errors, the result
14 of the proceeding would have been different." Id. at 694. "A reasonable probability is a
15 probability sufficient to undermine confidence in the outcome." Id.

16      A federal habeas court considering an ineffective assistance claim need not address
17 the prejudice prong of the Strickland test "if the petitioner cannot even establish
18 incompetence under the first prong." Siripongs v. Calderon, 133 F.3d 732, 737 (9th Cir.
19 1998). Conversely, the court "need not determine whether counsel's performance was
20 deficient before examining the prejudice suffered by the defendant as a result of the alleged
21 deficiencies." Strickland, 466 U.S. at 697.

22      The Due Process Clause of the Fourteenth Amendment guarantees a criminal
23 defendant effective assistance of counsel on his first appeal. Evitts v. Lucey, 469 U.S. 387,
24 391-405 (1985). Claims of ineffective assistance of appellate counsel are reviewed
25 according to the standard set out in Strickland. See Strickland, 466 U.S. at 668; Miller v.
26 Keeney, 882 F.2d 1428, 1433 (9th Cir. 1989). A petitioner thus must show his counsel's
27 advice fell below an objective standard of reasonableness and that there is a reasonable
28 probability that, but for counsel's unprofessional errors, he would have prevailed on appeal.

7

Miller, 882 F.2d at 1434 & n.9.

Appellate counsel does not have a constitutional duty to raise every nonfrivolous issue requested by a criminal defendant. Jones v. Barnes, 463 U.S. 745, 751-54 (1983). "[T]he weeding out of weaker issues is widely recognized as one of the hallmarks of effective appellate advocacy." Miller, 882 F.2d at 1434. Consequently, appellate counsel will "frequently remain above an objective standard of competence" and, for the same reason, will have caused his client no prejudice, specifically, because he or she "declined to raise a weak issue." Id.

Here, appellate counsel raised two issues on direct appeal: (1) the trial court's denial of a "Batson motion" during jury selection;[17] and (2) the trial court's exclusion of evidence showing certain witnesses were unable to identify him in a photographic lineup. (See Ex. E.) Petitioner claims appellate counsel should have raised seven additional issues, which the Court next addresses in turn.

1.   Exclusion of Non-identification Evidence

In his petition, petitioner claims appellate counsel was ineffective for failing to appeal the trial court's exclusion of evidence showing three eyewitnesses failed to identify petitioner in a photographic lineup. (Pet. at 6, Claim I (1), (2), and (3).) As noted above, however, appellate counsel did challenge the exclusion of that evidence. (See Exs. B, E.) The Court of Appeal's ultimate rejection of the claim does not demonstrate appellate counsel was ineffective.

In his traverse, petitioner argues appellate counsel did not present this claim "in its entirety." (Traverse at 12.) Specifically, petitioner argues his "initial trial judge," Garret J. Grant, ruled in limine that the "non-identifications" would be admissible at trial. (Traverse at 12-13.) Petitioner then argues that his "subsequent trial judge," Harlan G. Grossman, excluded the evidence of non-identification, in purported violation of the "collateral estoppel

---

[17] See Batson v. Kentucky, 476 U.S. 79, 89 (1986) (forbidding peremptory challenges of "potential jurors solely on account of their race").

8

doctrine." (Id.)[18] It is this purported violation that petitioner claims should have been raised on appeal. (Id.) The Court need not address petitioner's "collateral estoppel" argument because petitioner's recitation of the state trial court proceedings is incorrect. A review of the record shows Judges Grant and Grossman both ruled in limine to exclude the evidence of non-identification. (See Ex. J at 176-78; Ex. K at 638-44.)

Accordingly, petitioner is not entitled to habeas relief on this claim.

2. Trial Counsel's Failure to Call Expert Witnesses

Petitioner claims appellate counsel was ineffective in failing to argue petitioner's trial counsel was ineffective for failing to retain experts in "[c]ephalometrics, [s]cientific measurements of dimensions of the head," and in "[p]hotographic identification." (Pet. at 6, Claim I (4) and (5).)

To succeed on a claim that counsel was ineffective in failing to call a favorable witness, a federal habeas petitioner must identify the witness, provide the testimony the witness would have given, show the witness was likely to have been available to testify and would have given the proffered favorable testimony, and demonstrate a reasonable probability that, had such testimony been introduced, the jury would have reached a verdict more favorable to the petitioner. See Alcala v. Woodford, 334 F.3d 862, 872-73 (9th Cir. 2003). A petitioner's mere speculation that the witness would have given helpful information if interviewed by counsel and called to the stand is not enough to establish ineffective assistance. See Bragg v. Galaza, 242 F.3d 1082, 1087 (9th Cir.), amended, 253 F.3d 1150 (9th Cir. 2001); see also Grisby v. Blodgett, 130 F.3d 365, 373 (9th Cir. 1997) (holding "[s]peculation about what an expert could have said is not enough to establish prejudice").

In Dows v. Wood, 211 F.3d 480 (9th Cir. 2000), the Ninth Circuit denied a

---

[18] Petitioner initially was indicted and was scheduled for trial, with Judge Grant presiding over the pretrial motions. (Ex. K.) On June 28, 2004, prior to commencement of trial, the prosecutor moved to dismiss the case, and the charges were refiled the same day. (Ex. K at 645.) Petitioner thereafter was held to answer at a preliminary hearing that took place on July 14 and 16, 2004 before Judge Theresa J. Canepa. (Ex. A at 1.) Jury trial commenced on October 18, 2004 before Judge Grossman. (Ex. A at 180.)

9

petitioner's claim that his counsel had been ineffective in failing to investigate and call a witness, where the petitioner only provided his own "self-serving affidavit" and no other evidence, such as "an affidavit from [the] alleged witness," that the witness would have given helpful testimony. Id. at 486-87; cf. Alcala, 334 F.3d at 872 & n.3 (distinguishing, inter alia, Dows; finding ineffective assistance of counsel where petitioner submitted interviews reflecting testimony missing witnesses would have provided). As with the petitioner in Dows, petitioner here offers no evidence showing any proposed experts would have provided favorable testimony. He provides no affidavit from any such experts, nor any other evidence showing the testimony they would have given. Nor does petitioner provide any evidence demonstrating any such expert witness was available to testify at trial.

In sum, petitioner has not demonstrated his trial counsel was ineffective for failing to retain experts or that appellate counsel was ineffective for failing to so argue.

Accordingly, petitioner is not entitled to habeas relief on this claim.

### 3. Trial Counsel's Failure to Present "Similar Crimes" Evidence

Petitioner claims appellate counsel was ineffective in failing to argue trial counsel was ineffective for failing to present evidence of two other robberies in which petitioner was the suspect but was never convicted. (Pet. at 6, Claim I (6).) One robbery occurred in San Leandro in January 2004 and the other in Hayward in 1997. (See Ex. H at 23.)

Trial counsel could well have made a tactical decision not to seek to introduce evidence of the other robberies. Two of the witnesses in the San Leandro robbery had tentatively identified petitioner in a photographic lineup. (See Ex. A at 760-61.) While no criminal charges were filed against petitioner, no other person was charged or convicted. (Ex. A at 761, Ex J at 1081.) A reasonable attorney could have concluded the risk in presenting evidence of the San Leandro robbery, even if such evidence had any exculpatory value,[19] would open the door to inculpatory evidence from that same robbery, leading the jury to believe petitioner was in fact the perpetrator. As the trial court pointed out during

---

[19] Petitioner makes no showing that the evidence of the earlier robberies was in any manner exculpatory.

petitioner's pro se motion for a new trial, which was based in part on trial counsel's failure to offer such evidence[20]:

> Mr. Womack basically you are arguing that [defense counsel] should have introduced evidence of another bank robbery where, you know, people would come in, and they would focus on your photograph and thought that you were the bank robber, but they couldn't be a hundred percent sure.
> . . .
> I don't see how that really–competent defense attorney would really think along those same lines and follow that same tactic and seek to introduce that evidence.
>
> On the other hand, if, in fact, you know, they had identified the bank robber in San Leandro as being Joe Bank Robber, and they had an identification and they had a photograph and it looked like something–like similar to you, I would suspect that, you know, that [defense counsel] may well have made the motion and may well have sought to introduce that evidence and may well have succeeded.

(Ex. J at 1084.)

Similarly, petitioner was identified as the suspect in the 1997 Hayward robbery, but criminal charges were not filed. Petitioner was charged with a parole violation, but the charge was dismissed without prejudice. (See Ex. A at 761.) Once again, this was an unsolved crime, and no one was prosecuted. (Ex. A at 761, Ex. J at 1088.) As the trial court concluded:

> So, I mean, if, in fact, they had ever identified who was responsible for the . . . robbery of the Kragen's Auto Supply in Hayward, they had identified the individual, if the individual looked like you in any way, shape, or form, and, three, that person was out and about in the community in the area and available to commit the February 9, 2004, bank robbery at in Antioch, then I think that might have been evidence that competent defense attorney would seek to introduce.
>
> But short of that, you know, once you were released from the Morrisey hearing[21], I don't know that anything further happened with identifying the . . . robber from the Kragen's Auto Supply Store.

(Ex. J at 1088.)

In sum, petitioner has not demonstrated trial counsel was ineffective for failing to

---

[20] (See Ex. A at 727-54.)

[21] In Morrissey v. Brewer, 408 U.S. 471 (1972), the Supreme Court held parolees are entitled to a hearing to determine the factual basis for parole violations.

11

present evidence of the other robberies or that appellate counsel was ineffective for failing to raise a claim of ineffectiveness based thereon.

Accordingly, petitioner is not entitled to habeas relief on this claim.

4. <u>Failure to Challenge Trial Court's Suppression Ruling and Trial Counsel's Purported Failure to Further Investigate Search of Petitioner's Home</u>

Petitioner claims appellate counsel should have challenged the trial court's denial of the defense's motion to suppress evidence found in the search of petitioner's home. (Pet. at 6, Claim II.) The evidence at the preliminary hearing showed that, prior to searching petitioner's home, Detective Dee called the Alameda County Probation Department and was told petitioner was on probation and subject to a probation search condition. (Ex. A at 83-87.) Detective Dee then conducted a search based on what he believed to be a valid condition of petitioner's probation. (<u>Id.</u> at 88.) Defense counsel moved to suppress evidence found in the search, on the ground petitioner was not actually on probation at the time of the search and that the minute order showing petitioner to be subject to search was incorrect. (Ex. A at 661-62.)

The motion was heard by Judge Canepa. (Ex. A at 150-58.) In deciding the motion, the judge had to determine whether the search nonetheless could be justified under the "good faith" exception to the exclusionary rule. <u>See</u> <u>United States v. Leon</u>, 468 U.S. 897 (1984) (holding evidence seized in good faith reliance on warrant that is subsequently invalidated is not subject to exclusion). The prosecution's entitlement to such exception was, in turn, dependent on a factual determination as to whether the incorrect minute order was the product of a court error or of an error by law enforcement, in this instance, the probation department. <u>See</u> <u>Arizona v. Evans</u>, 514 U.S. 1, 12-14 (1995) (holding evidence seized in violation of Fourth Amendment as result of clerical errors of court employees, causing incorrect computer records, falls within good faith exception to exclusionary rule). Judge Canepa denied the motion to suppress, stating:

> I find by a preponderance of the evidence it is the People's burden and obligation to show erroneous information did not come from a law enforcement agency, and I do find that based upon the exhibits I reviewed, most specifically

1
2
3
4
5
6
7
> the CORPUS printout[22], and the minutes do show that the court record reflects erroneously a [] search and seizure clause. It is a court order.
> . . .
>
> It is based upon the testimony of the probation officer in this matter, supervising probation officer, Ms. Adamson, that CORPUS cannot be altered. That it is not [the] inputting system of the probation clerks to include matters on the CORPUS sheet upon which they rely,[23] and that is bolstered in fact by the original minute order from Judge Rolefson's clerk. Based on the fact the officer made the phone call, received information from probation Mr. Womack did have a search and seizure clause, despite the fact that information is erroneous, it is not subject to the exclusionary rule so I am going to deny the motion to suppress.

8 (Ex. A at 157-158.)

9       Petitioner contends appellate counsel should have challenged Judge Canepa's ruling.

10 Petitioner fails, however, to show a reasonable probability of a different outcome had

11 appellate counsel raised such claim. Specifically, given the historical facts supporting the

12 trial court's ruling as summarized above, petitioner fails to demonstrate a reasonable

13 probability exists that the trial court's ruling should have been reversed on appeal.[24] In

14 particular, as described by Judge Canepa and as further set forth in the record, the conviction

15 giving rise to petitioner's probationary sentence was for a misdemeanor (Ex. A at 37) and,

16 consequently, his probation was not likely to have been referred by the sentencing court to

17 the probation office for supervision (Ex. A at 29, 37). Under such circumstances, it would

18 appear that the probation employee who spoke to Officer Dee relied on the court records as

19 opposed to a record or file maintained by the probation department. (See id.)

20       Petitioner contends appellate counsel should have argued trial counsel was ineffective

21 for failing to "discover (bring forth) The Alameda County Probation Department log's, Log's

---

[22] According to testimony elicited at the preliminary hearing, CORPUS is a computerized criminal records system containing a probationer's criminal history, arrests, convictions, and probation status. (Ex. A at 25.)

[23] According to testimony elicited at the preliminary hearing, the probation office is unable to put information into the CORPUS system. (Id. at 52.)

[24] While the record before the Court does not include the minute order showing petitioner to be subject to a probation search condition, the transcript from the preliminary hearing reflects that the prosecution presented both that original minute order, showing the search clause box was checked off, as well as an amended order, showing the search clause had been corrected by the state court nunc pro tunc in June 2004, several months after Officer Dee conducted the search. (See Ex. A at 139-40.)

13

1 that would have revealed the identity (Name) of the Probation Clerk who speculatively gave
2 Detective William Dee, his search clause information." (Pet. at 7, Claim III.) Petitioner has
3 not shown, however, his trial counsel did not make reasonable efforts to discover the name of
4 the probation office employee who gave information to Detective Dee, or that his trial
5 counsel ultimately did not obtain that information.

6        In that regard, at the preliminary hearing, defense counsel asked the supervising
7 probation officer if she would be able "to track down who the specific probation officer
8 was?" (Ex. A at 57.) The supervisor was unsure whether such information was available as
9 she was not sure whether, or for how long, prior scheduling calendars were retained (id.),
10 adding that she had made an inquiry to determine who the probation officer was, but had not
11 yet received any information (id. at 57-58). Petitioner makes no showing that relevant
12 records were available or that the probation department otherwise could have provided the
13 information. Indeed, petitioner makes no showing that defense counsel ultimately did not
14 receive a name, speak to the employee involved, and thereafter make a tactical decision that
15 such individual was not able to provide helpful information. In sum, petitioner has not
16 shown trial counsel failed to adequately investigate or litigate his suppression motion. See
17 United States v. Schaflander, 743 F.2d 714, 721 (9th Cir. 1984) (holding petitioner must
18 make sufficient factual showing to substantiate ineffective assistance of counsel claim).

19        Accordingly, petitioner is not entitled to habeas relief on this claim.

20        5.     <u>Failure to Challenge Purported Violation of Trial Court's In Limine Ruling</u>

21        Petitioner claims appellate counsel should have challenged a violation of "Judge
22 Garret Grant['s] In-Limine Ruling . . . which prohibited [t]he new trial court from allowing
23 any [p]hotographs of [p]etitioner into evidence, but specifically booking photo of [p]etitioner,
24 [d]ated January – 2004, booking photo of [p]etitioner, dated February – 2004, [p]hotograph
25 of [p]etitioner taken with his daughter." (Pet. at 7, Claim IV.)

26        Petitioner's claim misrepresents Judge Grant's ruling. A review of the record shows
27 Judge Grant excluded any in-court or out-of-court identifications of petitioner by the
28 eyewitnesses. (Ex. K at 638-44.) Judge Grant did not rule that any otherwise admissible

14

1  photographs of petitioner could not be shown to the jury. (Id.)

2  Also, as discussed above, Judge Grant presided over the charges as initially brought
3  by indictment, after which the case was dismissed, the charges were refiled (Ex. K at 645),
4  and, several months thereafter, trial commenced before Judge Grossman. (Ex. A at 180.)

5  Because the admission of the photographs did not violate an in limine ruling, appellate
6  counsel could not have been unreasonable for failing to pursue such argument on appeal.

7  Accordingly, petitioner is not entitled to habeas relief on this claim.

      6.    <u>Trial Counsel's Failure to Challenge In-Court Identifications of Petitioner</u>

9  Petitioner claims appellate counsel was ineffective in failing to argue trial counsel was
10 ineffective for failing to move to exclude the in-court identifications of petitioner by Neighan
11 and Mullin. (Pet. at 8, Claim V.)

12 Both Neighan and Mullin testified they knew petitioner and recognized him as the
13 robber in the surveillance photographs. (Ex. J at 328-30, 421-23.)[25] Unlike the eyewitnesses
14 from the bank, neither was shown a photographic lineup. Consequently, they were not
15 subject to the in limine ruling excluding evidence of the identifications or non-
16 indentifications made by the eyewitnesses.

17 Petitioner claims the identifications made by Neighan and Mullin nonetheless were
18 "insufficient, unreliable, and unfounded" and that said witnesses were "convicted criminals."
19 (Pet. at 8.) To the extent petitioner challenges the credibility of Neighan and Mullin or the
20 weight accorded their testimony, such determinations were for the jury to make, and do not
21 go to the admissibility of the evidence.

22 Petitioner also claims the actions of the prosecutor tainted the identifications by the
23 eyewitnesses, and, consequently, "the identification of [p]etitioner by convicted criminals
24 Mullin or Neighan was also tainted, and improperly influenced by the prosecution." (Pet. at
25 8.) Petitioner provides no evidence that the prosecution "improperly influenced" Mullin or
26 Neighan. As discussed, neither witness was shown a photographic lineup. Each indicated
27 they recognized petitioner when they saw a newspaper article with a photograph of the

---

[25] Both witnesses referred to petitioner by his nickname, "Unique."

15

robber. (Ex. J at 328-30, 421-23.)

In sum, petitioner has not demonstrated trial counsel was ineffective for failing to move to exclude the in-court identifications by Neighan and Mullin, or that appellate counsel was ineffective for failing to raise such argument.

Accordingly, petitioner is not entitled to habeas relief on this claim.

### 7. Failure to Challenge Use of Prior Strikes

Petitioner claims appellate counsel should have challenged his sentence because the strike priors that were obtained in 1982 were the result of a plea bargain in which, according to petitioner, he was promised the convictions would not be used "for any future priors or enhancement purposes." (Pet. at 8, Claim VI.) Petitioner provides no record of the 1982 proceedings or any other evidence to support such claim, and petitioner's conclusory statement as to the terms of any plea agreement is insufficient. Without evidence to show the use of the priors actually violated a plea bargain, he fails to demonstrate appellate counsel acted unreasonably in failing to pursue this issue. See Schaflander, 743 F.2d at 721 (holding petitioner must make sufficient factual showing to substantiate ineffective assistance of counsel claim).

Accordingly, petitioner is not entitled to habeas relief on this claim.

## C. Appealability

The federal rules governing habeas cases brought by state prisoners require a district court that issues an order denying a habeas petition to either grant or deny therein a certificate of appealability. See Rules Governing § 2254 Cases, Rule 11(a).

A judge shall grant a certificate of appealability "only if the applicant has made a substantial showing of the denial of a constitutional right," 28 U.S.C. § 2253(c)(2), and the certificate must indicate which issues satisfy this standard, id. § 2253(c)(3). "Where a district court has rejected the constitutional claims on the merits, the showing required to satisfy § 2253(c) is straightforward: [t]he petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." Slack v. McDaniel, 529 U.S. 473, 484 (2000).

Here, petitioner has not made such a showing and, accordingly, a certificate of appealability will be denied.

## CONCLUSION

For the reasons stated above, the petition for a writ of habeas corpus is hereby DENIED, and a certificate of appealability is hereby DENIED.

The Clerk shall enter judgment in favor of respondent and close the file.

Additionally, the Clerk is directed to substitute Warden Tim Virga on the docket as the respondent in this action.

IT IS SO ORDERED.

DATED: February 29, 2012

MAXINE M. CHESNEY
United States District Judge